UNITED  STATES  DISTRICT  COURT
SOUTHERN  DISTRICT  OF  OHIO
WESTERN  DIVISION

MARK BRUNO,                          :          Case No. 3:12-cv-116
                                     :
        Plaintiff,                   :          Judge Timothy S. Black
                                     :
vs.                                  :
                                     :
COMMISSIONER OF                      :
SOCIAL SECURITY,                     :
                                     :
        Defendant.                   :

**ORDER THAT: (1) THE ALJ'S NON-DISABILITY FINDING IS FOUND
SUPPORTED BY SUBSTANTIAL EVIDENCE, AND AFFIRMED;
AND (2) THIS CASE IS CLOSED**

This is a Social Security disability benefits appeal.  At issue is whether the

administrative law judge ("ALJ") erred in finding the Plaintiff "not disabled" and

therefore unentitled to disability insurance benefits ("DIB") and Supplemental Security

Income ("SSI").  (*See* Administrative Transcript ("Tr.") (Tr. 24-33) (ALJ's decision)).

**I.**

Plaintiff applied for DIB on August 6, 2008 and SSI on August 8, 2008, alleging

an onset date of January 1, 2001.  (Tr. 24).  Plaintiff alleges disability due to

schizoaffective disorder[1] and obesity.  (Tr. 466, 41).  Plaintiff, and a vocational expert,

and a medical expert appeared at a hearing before an ALJ on May 5, 2010, after which

the ALJ found him not disabled.  (Tr. 32-33).  On July 6, 2011, the Appeals Council

_____

[1]     Schizoaffective disorder is a mental condition that causes both a loss of contact with
reality (psychosis) and mood problems.  Some experts do not believe it is a separate disorder
from schizophrenia.

denied Plaintiff's request for review, making the hearing decision the final decision of the commissioner.  (Tr. 17).  Plaintiff then commenced this action in federal court for judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

Plaintiff was 53 years old at the time of the ALJ hearing.  (Tr. 158).  Plaintiff completed two years of college and worked as a field engineer.  (Tr. 80).

The ALJ's "Findings," which represent the rationale of his decision, were as follows:

1.  The claimant met the insured status requirements of the Social Security Act through December 31, 2005.

2.  The claimant has not engaged in substantial gainful activity since January 1, 2011, the alleged disability onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: schizoaffective disorder (bipolar type) and obesity (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).  Having reviewed the medical evidence in its entirety and heard the claimant testify, the medical expert concurs with this conclusion.

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) subject to the following limitations: no climbing or ropes, ladders, or scaffolding; no exposure to hazards; no exposure to the general public; only low stress jobs with no over-the-shoulder supervision; only simple, one-or two-step tasks requiring little, of any, concentration, and; only limited contact with co-workers and supervisors and no teamwork.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on May 8, 1956, and was 44 years old, which is defined as a "younger individual age 18-49," on the alleged disability onset date.  The claimant subsequently changed age category to "closely approaching advanced age" at age 50 (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not he has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering his age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2001, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 26-32).

In sum, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Regulations, and was therefore not entitled to DIB or SSI.  (Tr. 33).

On appeal, Plaintiff argues that: (1) the ALJ erred in his assessment of the opinion of Plaintiff's treating physician in violation of 20 CFR 404.27d and Social Security Ruling 96-2p; and (2) the ALJ erred by relying on an improper hypothetical to the vocational expert which does not constitute substantial evidence of Plaintiff's vocational abilities.  The Court will address each argument in turn.

## II.

The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971).  In performing this review, the Court considers the record as a whole.  *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir. 1978).  If substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled.  As the Sixth Circuit has explained:

> "The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.  The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts.  If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm."

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The claimant bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits.  20 C.F.R. § 404.1512(a).  That is, he must present sufficient evidence to show that, during the relevant time period, he suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him unable to perform any job in the national economy.  42 U.S.C. § 423(d)(1)(A).

**A.**

The record reflects that:[2]

On August 19, 2003, Plaintiff saw George Learmonth, M.D., for a mental health evaluation at the Correctional Reception Center.[3]  (Tr. 382).  Dr. Learmonth reported that Plaintiff sometimes showed a kind of weird logic and seemed to not fully grasp the nature and seriousness of his crime.  (Tr. 383).  Plaintiff reported having had hallucinations of voices telling him what to do and criticizing him.  (*Id.*)  Dr. Learmonth indicated that psychological testing showed Plaintiff had a reading level of 6.8 and a GAMA of 86.[4] (*Id.*)  Dr. Learmonth diagnosed Schizo-Affective Disorder and provided a rule out diagnosis of Anti-Personality Disorder.  (*Id.*)  Plaintiff was assigned a GAF score of 60.[5]

In a health screening form dated September 11, 2003, it was noted that Plaintiff was slow to respond, and was shaking and nervous.  (Tr. 318).  It was further noted that

---

[2]    Plaintiff alleged disability beginning in 2001, but the record contains no relevant documents from 2001-2002.

[3]  Plaintiff was in prison for armed robbery.  (Tr. 28).

[4]  GAMA is the General Ability Measure for Adults.  The GAMA test is a self-administered, timed test that uses abstract designs, shapes, and colors to help measure general ability. The GAMA IQ score helps estimate an individual's general intellectual ability.  A score between 80-90 is a "low average" score.  A score of 90-110 is average.  Accordingly, Plaintiff scored slightly below average.

[5]  The Global Assessment of Functioning ("GAF") is a numeric scale (0 through 100) used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults, e.g., how well or adaptively one is meeting various problems-in-living.  A score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

Plaintiff talked of suicide. (*Id.*)

A suicide consultation dated September 12, 2003 recommended that Plaintiff be admitted for observation/stabilization. (Tr. 272). He was transferred from constant observation to close observation on September 12, 2003. (Tr. 271). Plaintiff was released from Crisis Watch on September 16, 2003. (Tr. 268).

In August 2004, Plaintiff was evaluated by a psychologist at the Chillicothe Correctional Institute and diagnosed with schizoaffective disorder and antisocial personality traits and assigned a GAF score of 55. (Tr. 380). The psychologist observed Plaintiff was friendly and cooperative. (*Id.*)

In a request for medication approval dated April 7, 2005, Michele Whaley, NPC, CNS, reported that Plaintiff had persistent auditory hallucinations and delusional thinking. (Tr. 332). Ms. Maxwell stated that he had failed trials with Risperdal and Geodon due to poor symptom remission. (*Id.*)

In October 2007 Plaintiff was assigned a GAF score of 80[6] by a psychiatric consultant at CCI. (Tr. 371-72). The consultant observed Plaintiff's mood was stable and he was social and engaged. (Tr. 370).

In January 2008, Plaintiff's progress notes indicate that he remained appropriate in a group setting while he participated in group therapy sessions. (Tr. 392, 395, 398). The

---

[6]    A score of 71-80 indicates that if symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork).

social worker observed that Plaintiff was a good group participant and noted that Plaintiff requested to continue in the group therapy. (Tr. 392, 398).

In a progress note dated April 11, 2008, while he was still incarcerated, a mental health treatment provider indicated that Plaintiff still experienced auditory hallucinations at times. (Tr. 393).

On April 14, 2008, Megan Maxwell, LSW, completed a mental status evaluation form. (Tr. 356-362). The form was signed by Stephanie Cassel, PhD, on August 15, 2008. (Tr. 362). Ms. Maxwell noted that Plaintiff's speech was rapid and pressured at times and his thoughts were very fragmented at times. (Tr. 356). She noted that his affect and mood was constricted. (Tr. 357). Ms. Maxwell reported that Plaintiff fidgeted at times and further noted that tremors were present at times. (Tr. 358). Ms. Maxwell indicated that mild paranoia was present at times and that Plaintiff had auditory hallucinations daily. (Tr. 359). Ms. Maxwell stated that Plaintiff mental ability to understand and follow instructions was mildly limited due to distractions of symptoms of mental illness. (Tr. 362). Ms. Maxwell stated his ability to relate to others was mildly limited and his mental ability to withstand the stress and pressures associated with day-to-day work activity was mildly limited, depending on his mental status. (*Id*). Ms. Maxwell indicated that when symptoms were exacerbated (such as auditory hallucinations), stress/pressure may be more than he can withstand. (*Id.*)

In a progress note dated June 26, 2008, while he was still incarcerated, a mental

-7-

health treatment provider reported that Plaintiff was angry thinking about his sentence and how the government stole his patent on a computer connector, which Plaintiff claimed to have seen in use on the space shuttle. (Tr. 391). Plaintiff reported still having auditory hallucinations, such as picking up on a passerby's thoughts. (*Id*.)

In August 2008, Plaintiff was evaluated by social worker Megan Maxwell, and the evaluation was later signed by licensed psychologist Dr. Stephanie Castle. (Tr. 356-62). They opined that Plaintiff was mildly limited with respect to his ability to understand and follow instructions; maintain attention to perform simple, repetitive tasks; relate to others, including coworkers and supervisors; and withdrawn stress/pressure associated with day to day work activity. (Tr. 362). Ms. Maxwell indicated that Plaintiff socialized with peers and staff daily with no record of disciplinary issues, and Plaintiff's mental status remained relatively stable during incarceration. (Tr. 356, 358, 361).

In September 2008, Dr. Flynn reviewed the record and opined that Plaintiff had no severe mental impairments. (Tr. 405-415). She indicated that Plaintiff had no episodes of decompensation, no restriction in activities of daily life, and mild limitations in maintaining social functioning and concentration, persistence or pace. (*Id*.) Dr. Flynn also concluded that Plaintiff had symptoms of schizoaffective disorder and antisocial personality, but did not have severe limitations as a result of his mental impairments. (Tr. 417). Dr. Flynn noted that Dr. Castle's opinion was consistent with the evidence. (*Id*.) In October, state agency psychologist Dr. Joan Williams reviewed the record and affirmed

-8-

Dr. Flynn's opinion. (Tr. 419).

In mid-January 2009, Plaintiff was released from incarceration and began outpatient mental health services at the C.A.M. (Tr. 468). The outpatient coordinator observed Plaintiff was happy and cooperative during a meeting to discuss his mental health services treatment plan. (*Id.*)

In an office note dated January 21, 2009, an outpatient services coordinator at C.A.M. reported that Plaintiff was verbose and engaged in some storytelling which required some redirection. (Tr. 468).

On January 29, 2009, Plaintiff saw Julie Gentile, M.D., for an initial psychiatric evaluation at C.A.M. (Tr. 463-467). Dr. Gentile noted that Plaintiff experienced auditory hallucinations. (Tr. 465). She noted that his thought process was circumstantial and tangential with grandiose and persecutory delusions. (*Id.*) Dr. Gentile reported Plaintiff's mood was anxious and affect was restricted. (Tr. 466). Dr. Gentile diagnosed Schizo-Affective Disorder, Bipolar type. (*Id.*)

In an office note dated February 13, 2009, Plaintiff reported having some auditory and visual hallucinations. (Tr. 459).

In an office note dated February 27, 2009, Plaintiff complained of "being subverted" by others. (Tr. 454). Plaintiff reported that he enjoyed the feeling of being "in danger" and had often participated in dangerous activities and behaviors. (*Id.*) Plaintiff discussed the voices he hears in his head, noting at times he felt the voices were talking to him and at times he felt they were talking about him. (*Id.*)

In an office note dated March 13, 2009, Plaintiff was noted to be cooperative, but he was also described as verbose and delusional thinking/speech was evident.  (Tr. 450).  He expressed anger toward the government concerning a patent he claimed to have for an item being used by NASA on the space shuttle.  (*Id.*)  He also spoke about a bizarre way to make methamphetamine that involved combining various substances in a fish tank and burying the fish tank underground for one month.  (*Id.*)

In an office note dated March 13, 2009, Plaintiff described delusions about a girl he saw on the bus and his belief that she was watching him and has an "undeniable interest" in him.  (Tr. 451).  Plaintiff reported feeling uncomfortable, paranoid, and unsafe when riding crowded buses.  (*Id.*)  He further indicated to his therapist that it is okay to have a relationship with a minor as long as they are not sexual.  (*Id.*)

In an office note dated March 20, 2009, Plaintiff describes his plan to sell a "crypto code" to the government.  (Tr. 445).  Furthermore, Plaintiff reports that he wants to attend school in the fall so he can "prove his knowledge" but also primarily for the "young/good looking girls."  (*Id.*)

In April, Plaintiff participated in four group counseling and therapy sessions.  (Tr. 430, 434, 436, 439).  A counselor observed during all of the sessions that Plaintiff was engaged in the group process, active in participating in the group, and also gave appropriate feedback to another group member during one session.  (Tr. 430, 434, 436, 439).

In an office note dated April 13, 2009, Plaintiff reports that he thinks of revenge

and wants to get back at the government and wants others to feel as miserable as he does. (Tr. 437).  He shared a distorted belief that an unidentified number on his phone is the police calling him to trap him into some legal bind.  (*Id.*)  He said others may think he is a pervert because he looks at younger looking girls.  (*Id.*)  He admitted that he would not mind a younger girl to be attracted to him because it would generate torment for the girl because she would not be able to be in a relationship with him because he is too old.  (*Id.*)

In an office note dated April 20, 2009, Plaintiff admitted that he was now looking for American women 18-24 years of age.  (Tr. 433).  He admitted that he prefers younger looking women, ages 14-24 but maintains that he would not be involved with someone under 18 because he fears prison.  (*Id.*)  However, he clearly likes to believe that young women admire him.  (*Id.*)

In a progress note dated April 27, 2009, Plaintiff reports feeling angry all the time and feeling angry at people in general due to his anger towards the government.  (Tr. 429).  He reports delusional thinking in that he was angry to see his "invention" on television.  (*Id.*)  He intends to release his "encryption method" online as an act of revenge against the U.S. Government if he is not recognized for his invention.  (*Id.*)  During group therapy, Plaintiff claimed to have patented an item that NASA was using illegally.  (Tr. 430).

In an office note dated May 11, 2009, Plaintiff reports that his goal is to have as many girlfriends as possible.  (Tr. 425).  He further indicated that relationships are a "game" and that "sex is just for fun" and that he looks for younger women and that the

-11-

youngest women he would get involved with is 18, because of the law. (*Id.*) Plaintiff expressed suspicions that others wanted to harm him. (*Id.*)

In an office note dated June 8, 2009, Plaintiff continued to hold delusions that random young women he encountered have an interest in him. (Tr. 526). He reported feeling "tormented" by these women. (*Id.*)

In an office note dated July 7, 2009, a therapist indicated that Plaintiff was fixating on two young women in his classes and had started to include them in his distorted thoughts. (Tr. 518).

In an office note dated July 14, 2009, Plaintiff disclosed more of his distorted beliefs about younger women and their "fixation" with him to his therapist and his mother. (Tr. 517). He became angry with his mother when she attempted to point out to him the absurdity of his thinking. (*Id.*) His counselor reported that his thought process seemed more tangential and loose than in previous sessions. (*Id.*) She described his affect as constricted. (*Id.*)

In an office note dated July 21, 2009, Plaintiff's counselor reported that he was verbose and continued to make claims about an invention of his that was stolen by NASA. (Tr. 515). He further reported that he was continuing classes at Sinclair, where he was focused on "the hotties" and hoped to meet one that showed an interest in him (*Id.*) His counselor stated that he was very self-absorbed and made sexist statements during the session. (*Id.*)

In an office note dated July 28, 2009, Plaintiff spent a lot of time discussing his

-12-

invention that NASA is supposedly using without his permission. (Tr. 514). His counselor also discussed some threatening statements made about a young woman in his class. (*Id.*) Mr. Bruno attempted to justify his statements and indicated he had no plan or intention of using violence. (*Id.*)

In an office note dated August 4, 2009, Plaintiff continued to talk about his invention that NASA is using and his anger at the government for not compensating him (Tr. 511). He also discussed his desire to have a relationship with a young woman and his tendency to objectify young women. (*Id.*) He refused to share his journal because he did not want his writings to be misinterpreted. (*Id.*)

In an office note dated August 11, 2009, Plaintiff continued to express anger at the government for not protecting his ideas. (Tr. 508). He discussed thoughts about American terrorists like Tim McVey and the Unabomber. (*Id.*)

In an office note dated August 25, 2009, Plaintiff confessed to being agitated and angry. (Tr. 502). He stated, "I don't believe in anything. (*Id.*) I don't have anything but my anger. (*Id.*) I really hate the government and I really hate America. (*Id.*) If I could destroy this place…." (*Id.*)

In an office note dated September 8, 2009, Plaintiff was agitated and continued to vent his anger about the government. (Tr. 500). He reported that he sent another letter to the White House to complain about the government stealing his "intellectual property" (*Id.*) Plaintiff's counselor indicated that he appeared depressed and agitated. (*Id.*)

In an office note dated September 14, 2009, Plaintiff felt compelled to justify his

-13-

actions and insist to his therapist that he is not a pervert for talking to girls at school.  (Tr. 499).

   In a progress note dated September 15, 2009, Plaintiff's counselor reported that he appeared agitated and depressed.  (Tr. 497).  The counselor indicated he demonstrated some criteria for Narcissistic Personality Disorder.[7]  (*Id.*)

   In an office note dated September 22, 2009, Plaintiff continued to rant about how the government had done him wrong.  (Tr. 494).  His counselor indicated that Plaintiff had sent emails to two local television stations to see if they would investigate his claims that the government stole his "intellectual property" and that NASA was using the invention without his permission.  (*Id.*)  His counselor indicated that he has little insight into his problems and continued to blame others for his situation.  (*Id.*)  He is making slight progress in treatment.  (*Id.*)

   In an office note dated September 29, 2009, Plaintiff continued to rant about his hatred of the government.  (Tr. 492).  He again threatened to release his "encryption code" to the terrorists.  (*Id.*)  The counselor indicated that Plaintiff continued to feel angry and resentful toward the government and young blonde women for their contribution to society.  (*Id.*)  The counselor indicated that Plaintiff's mood was depressed and angry.  (*Id.*)  The therapist indicated Plaintiff was making slight progress in treatment.  (*Id.*)

   In an office note dated October 19, 2009, the therapist indicated Plaintiff shows no

---

   [7]   Narcissistic Personality Disorder is a condition in which people have an inflated sense of self-importance and an extreme preoccupation with themselves.

remorse for his crime and takes no responsibility for the consequences. (Tr. 487). He has no compassion for himself and therefore none for others. (*Id.*) He continued to report anger at the government and society. (*Id.*)

In a record dated November 6, 2009, a counselor at C.A.M. called Plaintiff's parole officer to express concerns about Plaintiff's threats against the government and other groups of people. (Tr. 479). The counselor informed the parole office about Plaintiff's delusional thoughts and indicated that Plaintiff's psychiatrist had concerns about his potential to act out against others. (*Id.*)

In a progress note dated November 9, 2009, a community support specialist at C.A.M. reported that Plaintiff appeared frustrated and was very emotional and loud during their meeting. (Tr. 477).

In an office note dated November 10, 2009, Plaintiff indicated to his counselor that he could easily become a member of MENSA. (Tr. 475). Plaintiff vented anger about being given experimental medications while he was incarcerated that caused pock marks on his face. (*Id.*)

In an office note dated November 17, 2009, Plaintiff indicated that his "anger will go up against national security." (Tr. 474). Plaintiff vented anger about sending two proposals to two different agencies and getting two different responses. (*Id.*) Plaintiff reported controlling terrorists. (*Id.*)

On February 11, 2010, Julie Gentile, M.D., completed a mental impairment questionnaire at the request of Plaintiff's counsel. (Tr. 527-532). Dr. Gentile completed

-15-

the form on behalf of C.A.M.. (Tr. 527). Dr. Gentile indicated that Plaintiff had been

diagnosed with Schizoaffective Disorder, Bipolar Type. (*Id.*) Dr. Gentile opined that

Plaintiff was unable to meet competitive standards with respect to the following mental

abilities and aptitudes needed to do unskilled work: complete a normal workday and work

week without interruptions from psychologically based symptoms; accept instructions and

respond appropriately to criticism from supervisors; and, get along with co-workers or

peers without unduly distracting them or exhibiting behavioral extremes. (Tr. 529). Dr.

Gentile indicated that Plaintiff was preoccupied with his hatred of the government, and

young women. (Tr. 530). She indicated he made non-specific threats to do harm to

others. (*Id.*) Dr. Gentile stated that Plaintiff exhibited anti-social behaviors and

experienced suspicious and paranoid thoughts. (*Id.*) Dr. Gentile reported that Plaintiff

experienced marked difficulties in maintaining social functioning and marked difficulties

in maintaining concentration, persistence, or pace. (*Id.*) Dr. Gentile estimated that

Plaintiff would miss about three days of work per month as a result of his impairments or

treatment. (Tr. 532). Dr. Gentile stated Plaintiff had problems being socially appropriate

and also had difficulty managing anger and rage. (*Id.*) Dr. Gentile prescribed

schizophrenia and bipolar medications to treat Plaintiff and noted that Plaintiff had a fair

to good response to mediation and counseling. (Tr. 527).

## B.

First, Plaintiff argues that the ALJ erred in his assessment of the opinion of his

treating physician. Specifically, Plaintiff takes issue with the ALJ's failure to explicitly

address Dr. Gentile's conclusions that: (1) Plaintiff would be absent from work about three days per month as a result of his impairments or treatment; and (2) Plaintiff would be unable to meet competitive standards due to alleged mental limitations in completing a normal workday and workweek without interruptions from psychologically based symptoms, accepting instructions and responding appropriately to criticism from supervisors, and getting along with co-workers without unduly distracting them or exhibiting behavior extremes.

Contrary to Plaintiff's contention, Dr. Gentile was not Plaintiff's treating physician.[8] Plaintiff only saw Dr. Gentile three times and his opinion came approximately nine months after the last visit. (Tr. 420-21, 431-32, 463-67, 527-32). Accordingly, the ALJ was under no obligation to evaluate her opinion with special deference. *Cooper v. Astrue*, No. 2:10cv168, 2011 U.S. Dist. LEXIS 30788, at *28 (S.D. Ohio Jan. 25, 2011) ("Generally, the Sixth Circuit has declined to find that an ongoing treatment relationship exists after just two or three examinations."). In fact, while Dr. Gentile was an examining source, the substance of her opinion suggests she provided her

---

[8]   While the regulations recognize that the treating physician is presumed to be in the best position to consider a claimant's relevant impairments and limitations, they also recognize that the treating doctor's opinion does not bind the Commissioner when it is not supported by detailed clinical and diagnostic evidence. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). *See also Price v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 172, 176 (6th Cir. 2009) ("because [the treating physician] failed to identify objective medical findings to support his opinion [on a questionnaire] regarding Price's impairments, the ALJ did not err in discounting his opinion"). A treating source is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527 (d)(2).

conclusions as a reviewing physician.

Even if Dr. Gentile were a treating physician, the ALJ's opinion is properly supported. First, the ALJ agreed with most of Dr. Gentile's opinions regarding Plaintiff's functional limitations, namely that Plaintiff had marked difficulties in social functioning, only mild restrictions in activities of daily living, and no episodes of decompensation. (Tr. 28, 530). In fact, the ALJ commented that Dr. Gentile's opinion was "generally" consistent with the record and supported by objective medical evidence. (Tr. 30). This does not mean, however, that the ALJ's observation necessarily required him to grant the opinion controlling weight. However, the ALJ did not give controlling or differential weight to Dr. Gentile's conclusion that Plaintiff had a marked impairment in the mental ability to sustain concentration, persistence or pace based on the lack of evidence supporting the finding. (Tr. 30). Although the ALJ did not explicitly address other unsubstantiated conclusions indicated by Dr. Gentile, the ALJ implicitly explained that they are not entitled to controlling weight based on substantial evidence in the record. *Prince v. Astrue*, No. 1:10cv8, 2011 U.S. Dist. LEXIS 31530, at *8 (S.D. Ohio Jan. 11, 2011) ("there is no requirement . . . that an ALJ 'expressly' consider each of the factors [in 20 C.F.R. § 404.1527(d)(2) for weighing medical opinion evidence] within the written decision."). The ALJ properly considered and discussed the record, including medical assessments, treatment records, the medical expert's testimony, and Plaintiff's testimony in weighing Dr. Gentile's opinion and determining that Plaintiff was not disabled.

The ALJ points to substantial evidence in the record discounting Dr. Gentile's

uncorroborated opinions that Plaintiff would be unable to complete a normal workday.

Specifically, the ALJ noted that Plaintiff attended college and earned good grades, which

supports Plaintiff's ability to maintain a consistent work schedule. (Tr. 29-30). In fact,

Dr. Gentile opined that Plaintiff was not limited in his ability to maintain regular

attendance and be punctual and further noted that Plaintiff had a fair to good response to

medication and counseling. (Tr. 527, 529). Plaintiff was able to maintain a consistent

schedule and high grade point average in college while on medication and participating in

outpatient mental health services counseling. (Tr. 29-30). Furthermore, psychologist Dr.

Castle opined that Plaintiff was only mildly limited in his ability to withstand

stress/pressure associated with day to day work activity. (Tr. 362).

      Therefore, the ALJ reasonably determined that the evidence in the record does not

corroborate Dr. Gentile's conclusions that Plaintiff's mental impairments would cause

him to be absent from work about three times a month or unable to complete a workweek.

Moreover, Dr. Gentile offered no analysis or explanation in support of these limitations

and provided conflicting conclusions. *Haynes v. Astrue*, No. 1:11cv185, 2012 U.S. Dist.

LEXIS 6755, at *15 (S.D. Ohio Jan. 20, 2012) (the ALJ "properly discounted [treating

physician's] disability assessment because it was internally inconsistent"). Still, the ALJ

accommodated Plaintiff's limitations by restricting him to an atypical workday and

workweek with no exposure to the general public, only low stress jobs, only simple, one-

or two-step tasks requiring little concentration, and only limited contact with co-workers

and supervisors and no teamwork.

The ALJ also addressed Dr. Gentile's conclusions that Plaintiff was limited in his ability to function socially, specifically in his ability to accept instructions and respond appropriately to criticism from supervisors, and to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes. While recognizing that Plaintiff had social difficulties, the ALJ also noted that Plaintiff was capable of functioning socially in various contexts on a regular basis. (Tr. 29-30). For example, Plaintiff attended group therapy, college, and bible study. (*Id.*) Additionally, he rode the bus, shops, visited his mother, and played with his nephew. (Tr. 30). In fact, Plaintiff testified that some of his college classmates would ask him for help with math and that he would "share" his knowledge with them. (Tr. 65). These facts support a finding that Plaintiff is able to interact appropriately with others in social settings and accept instructions and respond appropriately to criticism from superiors, including college instructors or work supervisors. Plaintiff's group therapy counselors observed that Plaintiff was cooperative, gave appropriate feedback to others, and made progress in his group therapy treatment throughout 2009. (Tr. 426-27, 436, 439, 442, 444, 473, 478, 482, 486, 488, 491, 493, 495, 498, 503, 509, 522, 525).

The ALJ also considered opinion evidence in support of his decision. Dr. Gentile herself opined that while Plaintiff was limited, he was not precluded from working in coordination with or proximity to others. (Tr. 529-30). Additionally, Dr. Buban, the testifying medical expert, opined that Plaintiff would have significant restrictions on interacting with others, co-workers, and supervisors, but that Plaintiff experienced

improvement in functioning with medication and group therapy. (Tr. 72-73, 76-77). Dr. Buban opined that Plaintiff was restricted to working alone and with minimal contact with others or dealing with the pubic, but did not preclude Plaintiff from having contact with co-workers. (Tr. 74, 77-78).

The mental heath evaluation signed by Dr. Castle indicated that Plaintiff was only mildly limited in his ability to relate to others. (Tr. 362). Dr. Castle noted that Plaintiff's level of functioning will be affected by symptoms, but should be stable. (*Id.*) Dr. Castle noted that Plaintiff's mental status remained relatively stable during incarceration, functioned adequately in the general population, and had no problems with violence or aggressiveness while incarcerated. (Tr. 358). Dr. Castle also noted that Plaintiff took vocational classes effectively, and socialized with peers and staff daily with no record of disciplinary issues. (Tr. 361). State reviewing psychologists Dr. Flynn and Dr. Williams also opined that this mental impairment was "not severe" and concluded that he would only have mild limitations in social functioning. (Tr. 30, 415, 417, 419). Dr. Flynn further noted that the record shoes he can socialize with others. (Tr. 417).

Therefore, the ALJ reasonably concluded that Plaintiff is able to function in social settings. Moreover, the ALJ did accommodate Plaintiff's alleged inability to get along with others by restricting him to work were he had minimal contact with others. The ALJ properly considered the opinion evidence, the objective medical evidence, and other evidence in the record demonstrating that Plaintiff was capable of more social interactions than indicated by Dr. Gentile. Although the ALJ did not explicitly address

Plaintiff's limitations meeting competitive standards and absenteeism in his decision, the
ALJ committed no error and reasonably concluded Plaintiff was not so limited.

### C.

Next, Plaintiff argues that the ALJ erred by relying on an improper hypothetical to
the vocational expert ("VE") which does not constitute substantial evidence of his
vocational abilities with respect to his alleged inability to get along with co-workers or
peers.

"A vocational expert's testimony concerning the availability of suitable work may
constitute substantial evidence where the testimony is elicited in response to a
hypothetical question that accurately sets forth the plaintiff's physical and mental
impairments." *Smith v. Halter*, 307 F.3d 377, 378 (6th Cir. 2001).  The Sixth Circuit has
held that an ALJ is required to incorporate only those limitations found credible in posing
a hypothetical to a vocational expert. *Casey v. Sec'y of Health & Human Services*, 987
F.2d 1230, 1235 (6th Cir. 1993).

The ALJ's hypothetical accurately described Plaintiff and is supported by
substantial evidence in the record, as outlined in the RFC finding.  The ALJ described
Plaintiff's work experience and physical restrictions to the VE at the hearing, and
characterized his mental impairments as limiting him to no exposure to the general public,
limited contact with co-workers and supervisors, no teamwork, and no over the shoulder
supervision.  (Tr. 80-81).  The VE testified that the jobs he identified are independent,
and do not deal with the public or working with others.  (Tr. 84).  As explained *supra*, the

functional limitations included in the ALJ's hypothetical questions to the VE were proper and reasonable and therefore the ALJ did not err in relying on his answer to the hypothetical.

## III.

For the foregoing reasons, Plaintiff's assignments of error are unavailing.  The ALJ's decision is supported by substantial evidence and is affirmed.

**IT IS THEREFORE ORDERED THAT** the decision of the Commissioner, that Mark Bruno was not entitled to disability insurance benefits or supplemental security income, is found **SUPPORTED BY SUBSTANTIAL EVIDENCE**, and **AFFIRMED**; and, as no further matters remain pending for the Court's review, this case is **CLOSED.**

Date:  12/31/12                                    *s/ Timothy S. Black*
                                                   Timothy S. Black
                                                   United States District  Judge